UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
JEREMY KELLOGG and JONATHAN HARMON,

                           Plaintiffs,               Case No.: ███ .

          -against-                     1:23-cv-658 (DNH/CFH)

                                  **COMPLAINT FOR**
**INJUNCTIVE,**
JONATHAN C. NICHOLS, Individually and        **DECLARATORY, AND**
in his capacity as statutory licensing officer    **OTHER RELIEF**
pursuant to Penal Law 265.00(10); 400.00, *et seq.*

                            Defendant.
----------------------------------------------------------------x

      1.     Plaintiffs, JEREMY KELLOGG and JONATHAN HARMON, by their attorneys

The Bellantoni Law Firm, PLLC, for their Complaint for, *inter alia,* Injunctive and Declaratory

Relief, respectfully state:

      2.     In its June 23, 2022 Opinion in *NYSRPA v. Bruen*[1], the Supreme Court explicitly

rebuked discretionary firearm licensing regimes with subjective criteria "like New York's" that

"require the appraisal of facts, the exercise of judgment, and the formation of an opinion…"

*Bruen*, 2138 n. 9.

      3.     The *Bruen* Court cautioned 6 outlier states, including New York, that the survival

of their may-issue licensing schemes is contingent upon the transition to a shall-issue scheme with

objective criteria. *Id.*

      4.     Almost 1 year later, New York's Legislature and licensing officers continue to

disregard Supreme Court precedent – perpetuating a decades-old and grossly unconstitutional

---

[1] 142 S.Ct 2111 (2022).

"shall-not-issue-except" licensing scheme that imbues "broad discretion" in its licensing officers and imposes subjective criteria upon a preexisting protected right.

5.    Plaintiffs have no disqualifiers to the lawful possession of firearms under state or federal law. In fact, they both lawfully own  long arms which were purchased after they passed a federal background check through NICS (National Instant Criminal Background Check System).

6.    But under New York's scheme, Defendant exercised his "broad discretion", and the "appraisal of facts, the exercise of judgment, and the formation of an opinion" to deprive Plaintiffs of the Right to purchase, possess, and carry handguns for self-defense.

7.    New York's failure to heed the Supreme Court's warning in *Bruen* calls out for this Court to strike the State's unconstitutional "shall-not-issue-except" licensing scheme in its entirety.

8.    Over half of this Nation's states are "constitutional carry" (permitless) jurisdictions[2] that obey and enforce the plain text of the Second Amendment.

9.    And while the *Bruen* Court sanctioned existing shall-issue regimes, the imposition of *any* licensing requirement as a prerequisite to the exercise of presumptively protected – and **preexisting**[3] - right violates the plain text of the Second Amendment. A government imposed barrier to the Right to self-defense violates the Constitution.

10.    Rarely acknowledged, the 'plain text' mandates the Right **"shall not be infringed."**

---

[2] https://worldpopulationreview.com/state-rankings/constitutional-carry-states
[3] "…it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right…this is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed." *D.C. v. Heller*, 554 U.S. 570, 592 (2008) quoting, *United States v. Cruikshank*, 92 U.S. 542, 553 (1876) (emphasis supplied) (cleaned up).

## NATURE OF THE ACTION

11.    This is an action for declaratory, injunctive, and other relief, to include presumed monetary damages in at least a nominal amount, costs, disbursements, and reasonable statutory attorney's fees pursuant to 42 U.S.C. § 1988, for continuing irreparable harm to Plaintiffs arising from violations of their constitutional rights as codified in, and protected by, the Second and Fourteenth Amendments to the United States Constitution. 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

12.    Jurisdiction in this court is proper pursuant to 28 U.S.C. § 1331 in that this action arises under the United States Constitution and laws of the United States, and under 28 U.S.C. § 1343(a)(3) in that this action seeks to redress the deprivation, under of color of the laws, statutes, ordinances, regulations, customs, and usages of the State of New York, of rights, privileges or immunities secured by the United States Constitution. This action also seeks relief pursuant to 28 U.S.C. §§ 2201, 2202, and 42 U.S.C. § 1983, § 1988. Venue in this district is proper pursuant to 28 U.S.C. § 1391.

## THE PARTIES

13.    Plaintiff, JEREMY KELLOGG (hereinafter "Mr. Kellogg" or collectively Plaintiffs") is a citizen of the United States and a resident of Columbia County, State of New York.

14.    Plaintiff, JONATHAN HARMON (hereinafter "Mr. Harmon" or collectively "Plaintiffs") is a citizen of the United States and a resident of Columbia County, State of New York.

15.    Defendant, JONATHAN C. NICHOLS ("Defendant") sued herein individually and in his official capacity was, at all times relevant to this proceeding, a statutory firearm licensing officer for Columbia County pursuant to Penal Law § 265.00(10).

16.     At all times relevant to this action, Defendant was acting solely in his capacity as a statutory firearm licensing officer pursuant to Penal Law § 265.00(10).

17.     As a statutory licensing officer, Defendant was authorized to issue, deny, suspend, and/or revoke licenses issued pursuant to Penal Law § 400.00, *et seq*.

## CONSTITUTIONAL FRAMEWORK

18.     The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

19.     The Second Amendment codifies a "preexisting right."

> "[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right.
>
> The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it "shall not be infringed."
>
> As we said in *United States v. Cruikshank* …[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed ...."[4]

20.     The 'inherent right of self-defense' has been central to the Second Amendment right.[5] "Self-defense had little to do with the right's codification; it was the *central component* of the right itself." *Heller*, at 599 (emphasis supplied).

21.     The Second Amendment right of "the people…unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, at 580.

> " '[T]he people' seems to have been a term of art employed in select parts of the Constitution .... [Its uses] sugges[t] that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and

---

[4] *Heller*, at 592 (emphasis supplied) quoting, *Cruikshank*, supra.
[5] *Heller*, at 628.

> powers are reserved in the Ninth and Tenth Amendments, refers to a class of
> persons who are part of a national community or who have otherwise developed
> sufficient connection with this country to be considered part of that community."

*Heller*, at 580 quoting *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990).

22.     The Fourteenth Amendment provides, in pertinent part: No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. U.S. Const. amend. XIV.

23.     The Second Amendment *presumptively* protects the right to possess and carry all weapons in common use for self-defense. *Bruen*, at 2132 ("even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense") citing, *Caetano v. Massachusetts*, 577 U.S. 411, 411–412 (2016) (per curiam) (stun guns).

24.     Handguns are weapons in common use for self-defense and are protected within the scope of the Second Amendment. *Heller,* at 628 (recognizing handguns to be "an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose [self-defense].").

25.     In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court reiterated the text, history, and tradition standard of reviewing Second Amendment challenges, consistent with *Heller*, *McDonald*[6], and *Caetano*.[7]

---

[6] *McDonald v. Chicago*, 561 U.S. 742 (2010).
[7] "But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, at 2127. See also, *Caetano*,

26.    Flatly rejecting the 'interest balancing' 'intermediate scrutiny' test created by the Second Circuit (and others), the *Bruen* Court laid out a clear path to determine the constitutionality of government regulations affecting the Second Amendment: "We reiterate that the standard for applying the Second Amendment is as follows:

> "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.
>
> The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"

*Bruen*, at 2126. ("In sum, the Courts of Appeals' second step is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny.") (emphasis added) (citation omitted).

27.    Where later history contradicts what the text says, the text controls. *Bruen*, at 2137.


***Supreme Court Precedent Rejecting 'Discretion' in the Context of Second Amendment Rights***

28.    Relying on text, history, and tradition, the Supreme Court decisions in *Heller* and *McDonald* rejected the use of discretion in the context of Second Amendment rights.[8,9]

29.    Likewise, the *Bruen* Court rebuked the use of discretionary and subjective factors in firearms regulation, affirmatively rejecting licensing regimes "like New York's" that

---

[8] 19 "The very enumeration of the [Second Amendment] right takes out of the hands of government - even the Third Branch of Government - the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *D.C. v. Heller*, 554 U.S. 570, 634-35 (2008).
[9] *McDonald*, at 790-91 (2010) (rejecting Justice Breyer's idea that incorporation of the 14th Amendment "will require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise. As we have noted, while his opinion in Heller recommended an interest-balancing test, the Court specifically rejected that suggestion.").

"require[e] the appraisal of facts, the exercise of judgment, and the formation of an opinion…" *Bruen*, 2138 n. 9.

30.    In *Bruen*, the Supreme Court conditioned the continued existence of licensing regimes like New York on the State's transformation to restricting licensing officials to "only narrow, objective, and definite standards." *Ibid.*

31.    Likewise, Justice Kavanaugh's concurrence (joined by the Chief Justice) cautioned the 6 outlier 'may issue' states, of which New York is a member, that their continued implementation was dependent upon a transition to objective criteria:

> "Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so.
>
> Likewise, the 6 States including New York potentially affected by today's decision may continue to require licenses for carrying handguns for self-defense so long as those States employ objective licensing requirements like those used by the 43 shall-issue States."

*Bruen*, at 2162.

32.    The *Bruen* Court found New York's discretionary licensing scheme "unusual" and "constitutionally problematic", in part, because it grants open-ended discretion to licensing officials. *Bruen*, at 2161.

33.    But New York is not merely a may-issue state – its scheme mandates "no license shall be issued or renewed unless…"

## NEW YORK STATE LICENSING SCHEME

34.    Requiring an individual to seek and obtain a license from the government to exercise the pre-existing right to purchase, possess, and/or carry a weapon in common use for self-defense does not survive the text, history, and tradition test announced in *Bruen* and is ***patently inconsistent*** with the plain text of the Amendment, which "shall not be infringed."

35.     After *Bruen*, New York State neither fell in line with its sister "constitutional carry" states nor did it heed the Supreme Court's warning; licensing officers remain empowered with 'broad discretion' to deny licenses to people who, like Plaintiffs, are not prohibited under state or federal law from possessing firearms.[10] Close to one year later, New York has taken no steps to restrict its licensing scheme to "only narrow, objective, and definite standards."

36.     New York continues to impose a shall-not-issue-unless[11] licensing scheme that vests "broad discretion" in licensing officers[12], and requires subjective opinion forming in the denial, issuance, renewal, suspension, and revocation of a license.

37.     Subjective "moral character" assessments by licensing officials have been part of New York's scheme since its inception in 1911.

38.     Defiant to *Bruen*'s unambiguous directive, New York responded to the Supreme Court opinion by immediately passing the Concealed Carry Improvement Act which, among other restrictions, doubled down on the subjective assessments to be made by licensing officials from determining whether an individual has "good moral character" to whether the individual is "of good moral character, which …shall mean having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it ***only in a manner that does not endanger oneself or others***."[13]  Penal Law § 400.00(1)(b) (emphasis added).

39.     The entire purpose of possessing firearms for self-defense is to use them in a manner that endangers others – that's what self-defense means.

---

[10] The term "firearms" as used herein refers generally to handguns, rifles, shotguns, and "other firearms."
[11] "**No license shall be issued or renewed** pursuant to this section except by the licensing officer, and then only after investigation and finding that all statements in a proper application for a license are true. **No license shall be issued or renewed except** for an applicant…" N.Y. Penal Law § 400.00(1).
[12] *Franzese v. Ryder*, 200 A.D.3d 979 (2d Dept. 2021) ("A pistol licensing officer has broad discretion in ruling on permit applications"); *Fitzgerald v. McLoughlin*, 198 A.D.3d 760 (2d Dept. 2021) ("broad discretion" to deny application to amend license to add another handgun); *Zeltins v. Cook*, 176 A.D.3d 1574, 1575 (2d Dept. 2019) ("A licensing officer, such as respondent, has broad discretion to grant or deny a permit under Penal Law § 400.00(1)").
[13] Penal Law § 400.00(1)(b).

40.     By requiring that a firearm license "***shall not issue unless***" the individual will use the weapon "***only in a manner that does not endanger oneself or others***", the licensing scheme frustrates the "central component"[14] of the Second Amendment.

41.     Section 400.00(1)(b) is the type of subjective factor explicitly rejected by the *Bruen* Court – it requires the "appraisal of facts, the exercise of judgment, and the formation of an opinion." *Bruen,* at 2138, n. 9.

42.     And Penal Law § 400.00(1)(o)(v) gives licensing officers unfettered discretion to expand upon the requirements of Penal Law § 400.00(1)(o)(i)-(v). *Kamenshchik v. Ryder*, 78 Misc. 3d 646, 651, 186 N.Y.S.3d 797, 803 (N.Y. Sup. Ct. 2023).

43.     But even securing a license in New York does not solidify one's Second Amendment Rights.  Licensees are constantly under the unyielding judgmental discretion of a public servant.

44.     Under the scheme, "a license may be revoked and cancelled at any time" by a licensing officer – even for events and conditions that do not disqualify the licensee from lawfully possessing firearms under state or federal law.[15] A firearms license can be suspended or revoked if "***at any time***" a licensee becomes "ineligible to obtain a license, including engaging in conduct that would have resulted in the denial of a license…"[16]

45.     Meaning that ***anything*** that the licensing officer feels shows that a licensee has 'lost' essential character, temperament and judgement necessary to be entrusted with a weapon

---

[14] *Heller*, at 599.
[15] Penal Law § 400.00(11)(a).
[16] Penal Law § 400.00(11)(a).

and to use it only in a manner that does not endanger oneself or others"[17] constitutes grounds for suspension and/or revocation.[18]

46.     And the suspension or revocation of a license for any reason – not just prohibiting convictions, orders of protection, insanity, and other statutory disqualifiers - ***requires*** the confiscation of all handguns, shotguns, and rifles.[19]

47.     Put differently, New York's offensively unconstitutional licensing scheme subjects a licensee who has no prohibitors under state or federal law to the purchase and possession of firearms generally, to the summary suspension and/or revocation of their license and summary confiscation of ***all of guns*** based solely on the "broad discretion" of a government official. See, *Juzumas v. Nassau Cnty. New York*, 33 F.4th 681, 687 (2d Cir. 2022) (confirming that Penal Law § 400.00(11) requires the confiscation of all handguns, rifles, and shotguns if a firearm license is suspended or revoked for "any of the reasons stated in § 400.00 that a person may be ineligible to obtain a handgun license."

48.     Because of New York's discretionary licensing scheme, statutory licensing officers like Defendant continue to have "broad discretion" to measure one's worthiness to exercise the Right.

49.     This includes inquiries into past arrests that resulted in a dismissal, were sealed by the court, and/or otherwise did not result in a disqualifying conviction.

---

[17] Penal Law § 400.00(1)(b).
[18] And despite *Bruen,* New York's vehicle for such an administrative challenge – CPLR Article 78 – ***continues*** to impose a rational basis review of decisions made by licensing officers through its "arbitrary and capricious" test. See, e.g., in *Kamenshchik*, at 803 (continuing to perpetuate the mantra that licensing officers have "broad discretion" to seek any information they believe will assist in evaluating the license application, and reminding that it is "well settled that a court may not substitute its judgment" for licensing officers unless the decision under review is "arbitrary and unreasonable and constitutes an abuse of discretion."
[19] Penal Law § 400.00(11)(c).

50.     Under New York State Executive Law § 296(16), individuals seeking a license issued under Penal Law § 400.00, *et seq.* are required to disclose past arrests and/or charges that were:

- terminated in favor of the accused (C.P.L. 160.50);

- adjourned in contemplation of dismissal (C.P.L. 170.55, 170.56, 210.46, 210.47, or 215.10);

- youthful offender adjudications (C.P.L. 720.35);

- non-criminal violations sealed by the court (C.P.L. 160.55); and

- convictions sealed pursuant to C.P.L. 160.59 and/or 160.58.

51.     None of the above events constitutes an objective disqualifier to firearm possession.

52.     Not one of the above events prevents an individual from purchasing, possessing, and/or carrying a rifle or shotgun – whether under New York State law or federal law.

53.     The same statute forbids potential employers from inquiring into the above events and protects applicants for employment from having to disclose the above information[20] even though employment is merely a 'privilege,' and not a Right protected by the U.S. Constitution.

54.     In an employment scenario, an "individual required or requested to provide information in violation of this subdivision may respond as if the arrest, criminal accusation, or disposition of such arrest or criminal accusation did not occur." Executive Law § 296.

---

[20] "It shall be an unlawful discriminatory practice, unless specifically required or permitted by statute, for any person, agency, bureau, corporation or association, including the state and any political subdivision thereof, to make any inquiry about, whether in any form of application or otherwise, or to act upon adversely to the individual involved, any arrest or criminal accusation of such individual not then pending against that individual…"

55.     But individuals seeking to protect themselves by exercising rights presumptively protected by the Second Amendment, like Plaintiffs, are barred from responding "as if the arrest, criminal accusation, or disposition of such arrest or criminal accusation did not occur."

56.     Executive Law § 296(16) violates the Second and Fourteenth Amendments and must be stricken.

## NEW YORK'S STATUTORY LICENSING OFFICERS

57.     New York's statutory licensing officers are either police commissioners (New York City, Nassau County, and Suffolk County) or elected state court judges. Penal Law § 265.00(10).

58.     Police commissioners and those individuals to whom they delegate decision making authority on licensing applications, can be sued in their individual capacities when they violate the Second and Fourteenth Amendment rights of applicants and licensees. 42 U.S.C. § 1983.

59.     As with police commissioners, all other statutory licensing officers should be treated uniformly to allow all New York applicants and licensees to be treated equally.

60.     Indeed, judicial licensing officers have not only sworn an oath to uphold the U.S. Constitution upon taking office[21], as an inferior state court they are mandated to adhere to Supreme Court precedent, particularly on constitutional issues. See, e.g., *State v. Robert V.*, 31 Misc. 3d 1210(A), 929 N.Y.S.2d 203 (Sup. Ct.), on reargument, 33 Misc. 3d 1208(A), 939 N.Y.S.2d 744 (Sup. Ct. 2011), aff'd, 111 A.D.3d 541, 975 N.Y.S.2d 390 (2013) ("this Court is constrained to follow the precedent established by the Supreme Court") citing, *Hynes v. Tomei*, 92 N.Y.2d 613,

---

[21] Under New York State Constitution section XIII, "Members of the legislature, and all officers, executive and judicial, except such inferior officers as shall be by law exempted, shall, before they enter on the duties of their respective offices, take and subscribe the following oath or affirmation: 'I do solemnly swear (or affirm) that I will support the constitution of the United States, and the constitution of the State of New York, and that I will faithfully discharge the duties of the office of ......, according to the best of my ability.'"

629 (1998) (state courts are bound under the Federal Constitution to follow controlling Supreme

Court precedent), cert. denied, 527 U.S. 1015 (1999); *People v. Cortes*, 80 N.Y.2d 201, 211 (1992)

(trial court bound to follow existing precedent); see also, *Flanagan v. Prudential–Bache Securities,*

*Inc.*, 67 N.Y.2d 500, 506 (1986), cert. denied 479 U.S. 931 (1986) (recognizing that state courts

are bound to apply United States Supreme Court precedent and precedent from the lower Federal

courts to the extent that such precedent is in agreement); *Peterson v. Martinez*, 707 F.3d 1197,

1210 (10th Cir. 2013) (inferior courts "are bound by Supreme Court dicta almost as firmly as by

the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later

statements.").

61.     Intentional and unmistakable disregard for Supreme Court precedent, including

*Bruen*'s rejection of "discretion" in firearms licensing, requires individual accountability.

62.     Applicants and licensees outside of New York City, Nassau County, and Suffolk

County – like Plaintiffs – are being treated differently than their counterparts.

63.     Article I, § 1 of the New York State Constitution provides,

> "No member of this state shall be disfranchised, or deprived of any of the rights
> or privileges secured to any citizen thereof, unless by the law of the land, or the
> judgment of his or her peers, except that the legislature may provide that there
> shall be no primary election held to nominate candidates for public office or to
> elect persons to party positions for any political party or parties in any unit of
> representation of the state from which such candidates or persons are nominated
> or elected whenever there is no contest or contests for such nominations or
> election as may be prescribed by general law."

64.     The actions and duties imposed on statutory licensing officers are ministerial duties

- not judicial functions - because firearms licensing is not a discretionary act. Reading a criminal

history report and mental health background check to determine whether an individual is

prohibited from possessing firearms are ministerial functions[22] - either an individual is firearms prohibited or they are not.

65.     Plaintiffs and all similarly situated people should not be deprived of the right to redress for constitutional violations, including the right to seek monetary damages, and damages in at least a nominal amount for the violation of their Second and Fourteenth Amendment rights by statutory licensing officers.

66.     Immunity from suit for constitutional violations should be available for those aggrieved by a statutory licensing officer anywhere in New York State.

## MATERIAL FACTS

*Plaintiffs*

67.     Plaintiffs Jeremy Kellogg and Jonathan Harmon are citizens of the United States, homeowners, and residents of Columbia County, New York.

68.     Plaintiffs are part of 'the People' for whom the Second Amendment was codified.

69.     Neither Plaintiff is disqualified from possessing, purchasing, receiving, or transferring firearms[23] under state or federal law.

70.     Plaintiffs are law-abiding, contributing members of the community.

71.     Each Plaintiff owns long guns, which they purchased through a federal firearms licensee (FFL/gun store) after being subjected to, and passing, federal background checks through the National Instant Criminal Background Check System (NICS).

---

[22] *People ex rel. Ferris v. Horton*, 147 Misc. 506, 507, 264 N.Y.S. 84, 86 (Co. Ct. 1933), aff'd, 239 A.D. 610, 269 N.Y.S. 579 (App. Div. 1934) (expressing the general judicial consensus that the Sullivan Law was "vulnerable" because "it imposes ministerial duties upon judicial officers. The principle is so well settled that extensive elaboration or citation of authority is not required. It is clear that ministerial duties may not be imposed upon judicial officers."
[23] The term "firearm" as used herein refers to handguns and long guns collectively.

14

72.     Under New York State General Business Law § 898, every[24] "sale, exchange or disposal" of a handgun, shotgun, and/or rifle must be conducted through an FFL/gun store and only after the individual passes a NICS background check.[25]

***Jeremy Kellogg***

73.     Jeremy Kellogg, age 34, has served in the Army National Guard since his enlistment in 2020.

74.     Mr. Kellogg holds a "secret clearance" in the Army National Guard duty, which required that he meet several requirements, including being a United States citizen; sponsorship through his Army National Guard command; completing a F-86 National Security Questionnaire, passing a background investigation conducted by an investigating agency, such as the FBI, Office of Personnel Management, or Department of Defense, into his employment, education, financial, personal and travel history to determine his suitability for a secret clearance; and verification that he holds a designated position that requires him to access classified information on the secret level requiring a certain level of 'need-to-know.'[26]

75.     Mr. Kellogg regularly carries a handgun in the course of his military service.

76.     When not in service, Mr. Kellogg is employed by New York State with the Office of People with Disabilities and is responsible for supervising 11 staff.

77.     Mr. Kellogg has also served the community as a volunteer fireman for several years.

---

[24] Except "immediate family", which is defined as "spouses, domestic partners, children and step-children." See, GBL § 898.
[25] Upon completion of such background check, the FFL/gun store "shall complete a document, the form of which shall be approved by the superintendent of state police, that identifies and confirms that such check was performed." *Id.*
[26] https://work.chron.com/secret-clearance-requirements-army-national-guard-23367.html

78.     Desiring to purchase, possess, and carry handguns for self-defense, Mr. Kellogg applied for a New York State pistol license by submitting the required application, documents, and payment to the Columbia County Sheriff's Office in February 2022.

79.     Mr. Kellogg's handgun license application was assigned to Defendant in his capacity as statutory handgun licensing officer.

80.     Defendant was informed by the Columbia County Sheriff's Office, after the completion of its investigation into Mr. Kellogg's background, that Mr. Kellogg had never been convicted of a crime, had no mental health prohibitors to the possession of firearms, and had no disqualifiers to the possession of firearms.

81.     Defendant held a face-to-face interview with Mr. Kellogg for the purpose of deciding whether Mr. Kellogg had the "moral character" necessary for the issuance of a handgun license.

82.     Defendant inquired into previously disposed of charges against Mr. Kellogg, each of which were sealed by the respective courts.

83.     The first charge discussed by Defendant occurred when Mr. Kellogg was 16 years old (over 18 years ago), did not result in a criminal conviction, and was sealed from public access.

84.     The second charge discussed by Defendant occurred when Mr. Kellogg was 18 years old, was resolved by an adjournment in contemplation of dismissal and "sealed upon termination of criminal action in favor of the accused" pursuant to NYS Criminal Procedure Law § 160.50.

85.     Mr. Kellogg unintentionally failed to disclose the above sealed arrests on his written application. However, when he was questioned by the Columbia County Sheriff's Office during his background investigation, Mr. Kellogg openly discussed them with the investigator.

86.   At the hearing, Mr. Kellogg informed Defendant that he did not intentionally withhold the 2 sealed events, and would have included them had he recalled them – he "did not mean not to disclose them."

87.   Mr. Kellogg informed Defendant that he is "allowed to carry a pistol in the military" and asked, "why wouldn't I be allowed to carry a pistol as a civilian?"

88.   At the end of the hearing, Defendant advised that he is "backlogged" but would "get to this [decision] as soon as [he] can."

89.   Six (6) months later, Defendant notified Mr. Kellogg that his application was denied.

90.   Nothing in Mr. Kellogg's criminal history would prevent the issuance of a license to carry a firearm to Mr. Kellogg in a shall-issue state.

91.   Nothing in Mr. Kellogg's criminal history would prevent him from carrying a firearm for self-defense in a constitutional carry state.

92.   Nothing in Mr. Kellogg's criminal history disqualifies him from possessing firearms – whether under state or federal law.

93.   Nothing in Mr. Kellogg's criminal history has prevented his purchase of firearms after a federal NICS background check.

94.   Because of New York's discretionary licensing scheme, Defendant exercised "broad discretion" in denying Mr. Kellogg the right to possess and/or carry a handgun for self-defense.

95.   Defendant's denial of Mr. Kellogg's application was based solely on his feelings that Mr. Kellogg "lacked credibility", Defendant's opinions of Mr. Kellogg's "presentation and demeanor" at the in-person hearing, and Defendant's assessment of Mr. Kellogg's "criminal arrest

history", and Defendant's opinion that Mr. Kellogg "do[es] not have the requisite maturity or responsibility to hold a pistol license."

96.     Defendant's denial of Mr. Kellogg's application prevents Mr. Kellogg from purchasing a handgun, possessing a handgun in his home for home protection, and carrying a handgun for self-defense in public.

97.     Defendant's exercise of discretion violated Mr. Kellogg's Second and Fourteenth Amendment rights.

98.     Defendant's denial of Mr. Kellogg's license application violated Mr. Kellogg's Second and Fourteenth Amendment rights.

### *Jonathan Harmon*

99.     Jonathan Harmon, age 32, is an avid hunter and regularly engages in sport target shooting.

100.    Like Jeremy Kellogg, Mr. Harmon owns long guns which were purchased through an FFL in New York State after passing a federal NICS background check.

101.     Mr. Harmon is an African American man who grew up in Brooklyn, New York and moved to Columbia County to raise his family in a safer, more structured community and environment than where he grew up.

102.    Mr. Harmon has been licensed by New York State as a security guard since 2012.

103.    Mr. Harmon has been employed for over 10 years as a mechanic with Mercedes.

104.    Like Mr. Kellogg, Mr. Harmon sought to purchase, possess, and carry handguns for self-defense for himself and his family.

105.    Mr. Harmon applied for a New York State pistol license by submitting the required application, documents, and payment to the Columbia County Sheriff's Office.

106.    Mr. Harmon's handgun license application was assigned to Defendant in his capacity as statutory handgun licensing officer.

107.    Defendant was informed by the Columbia County Sheriff's Office, after the completion of its background investigation, that Mr. Harmon has never been convicted of a crime, has no mental health prohibitors to the possession of firearms, and no disqualifiers to the possession of firearms.

108.    Defendant held a face-to-face interview with Mr. Harmon for the purpose of deciding whether he had the "moral character" necessary for the issuance of a handgun license.

109.    Like his meeting with Jeremy Kellogg, Defendant delved into Mr. Harmon's past – from an event that occurred when Mr. Harmon was 17 years old (over 15 years ago) to charges that were either dismissed and sealed or resulted in a non-criminal adjudication.

110.    Notwithstanding that *nothing* in Mr. Harmon's past disqualifies him from purchasing, possessing, and carrying firearms, he explained to Defendant that he takes "full responsibility" for his past actions, that he "learned a great lesson", was "very young and immature at the time [and] didn't understand how… detrimental" his choices could have been for his life and future.

111.    Because of New York's discretionary licensing scheme, Defendant had "broad discretion" to deny Mr. Harmon's application.

112.    Relying on Mr. Harmon's "arrest history," in-person testimony that Defendant opined to "display[] a willingness to knowingly violate the Penal Law" for his own purposes, and

his "observation of" Mr. Harmon's "presentation and demeanor" Defendant denied Mr. Harmon's application.

113.    While conceding Mr. Harmon has "taken steps to change his life to be a law abiding citizen," Defendant denied the application based on his opinion that Mr. Harmon "does not have the requisite maturity or responsibility to hold a pistol license."

114.    Defendant's denial of Mr. Harmon's application prevents Mr. Harmon from purchasing a handgun, possessing a handgun in his home for home protection, and carrying a handgun for self-defense in public.

115.    Defendant's exercise of discretion violated Mr. Harmon's Second and Fourteenth Amendment rights.

116.    Defendant's denial of Mr. Harmon's license application violated Mr. Kellogg's Second and Fourteenth Amendment rights.

117.    Second Amendment rights are not contingent upon a government official's subjective opinion – the Amendment's ratification was the "very product of an interest balancing by the people" and "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense. It is this balance—struck by the traditions of the American people - that demands our unqualified deference." *Bruen*, at 2131 (citation omitted).

118.    There is also no historical tradition of a governmental barrier to the possession of weapons for self-defense based on petty and/or nominal offenses, non-criminal adjudications, and/or the subjective opinions of a government official.

*Defendant Was Bound to Adhere to the Constitution and Supreme Court Precedent*

119.    Defendant was "bound to adhere not only to results of [U.S. Supreme Court] cases, but also to their explications of the governing rules of law." See, e.g., *County of Allegheny v. ACLU*, Greater *Pittsburgh Chapter*, 492 U.S. 573, 668 (1989) (Kennedy, J., dissenting); *see also Balintulo v. Daimler AG*, 190 (2d Cir. 2013) (Lower courts are bound and are without authority to "reinterpret" the Supreme Court's binding precedent); *NLRB v. Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, Local 229, AFL-CIO*, 974 F.3d 1106, 1116 (9th Cir. 2020) ("Lower court judges don't have license to adopt a cramped reading of a case in order to functionally overrule it.").

120.    Defendant's denials of Plaintiffs' applications are based entirely on his "appraisal of facts, the exercise of judgment, and the formation of an opinion" [27] – factors rebuked by the *Bruen* Court - to reach the conclusions that Plaintiffs "do[] not have the requisite maturity or responsibility to hold a pistol license."

121.    Defendant's exercise of discretion and application of subjective criteria is inconsistent with the plain text of the Second Amendment, *Heller*, *McDonald,* and *Bruen*.

122.    Plaintiffs' conduct – possessing a handgun for self-defense and carrying a handgun in public for self-defense – is presumptively protected by the Second Amendment.[28]

123.    By depriving Plaintiffs of the right to engage in conduct "presumptively protected" by the Second Amendment[29] - the right to possess (keep) and carry (bear) handguns (Arms), Defendant violated Plaintiffs' Second and Fourteenth Amendment rights.

---

[27] *Bruen*, at 2138, n. 9.
[28] "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, at 2126. "The Court has little difficulty concluding also that the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct - carrying handguns publicly for self-defense." *Bruen*, at 2119.
[29] "In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, at 2126.

124.    Plaintiffs' fingerprint-based criminal history report, and the Sheriff Office investigation pursuant to Penal Law 400.00(4) – information in Defendant's possession - bear out the absence of any legal barrier under state or federal law to Plaintiffs' possession and carriage of firearms.

125.    Defendant was bound to adhere to the Supreme Court's edict in *Bruen* and the plain text of the Second Amendment irrespective of the State's unconstitutional licensing scheme.

126.    Objective criteria demonstrate that Plaintiffs are eligible to possess and carry firearms and the denial of their applications was unconstitutional.

127.    Plaintiffs have suffered and continue to suffer the deprivation of guaranteed individual rights that are presumptively protected by the Second and Fourteenth Amendments.

128.    Based on the above, Plaintiffs have suffered an injury-in-fact, to wit, the absolute barrier to conduct covered by the plain text of the Second Amendment. Plaintiffs will continue to suffer such injury-in-fact without the relief requested herein.

129.    Plaintiffs seek to hold Defendant personally liable for the violations of their constitutional rights through, *inter alia*, an award of monetary damages just as the residents of New York City, Nassau County, and Suffolk County are able to seek full redress against licensing officers in those jurisdictions.

130.    Only through the imposition of personal liability and monetary damages will judicial licensing officials be motivated to soberly adhere to the Constitution.

**AS AND FOR A FIRST CAUSE OF ACTION**

131. Repeats and realleges paragraphs "1" through and including "130."

132. Under the theory that New York State's discretionary "shall-not-issue-unless" licensing scheme, Penal Law § 400.00, *et seq.* violates the Second and Fourteenth Amendments. 42 U.S.C. § 1983.

**AS AND FOR A SECOND CAUSE OF ACTION**

133. Repeats and realleges paragraphs "1" through and including "132."

134. Under the theory that Defendant violated Plaintiffs' Second and Fourteenth Amendment rights. 42 U.S.C. § 1983.

**AS AND FOR A THIRD CAUSE OF ACTION**

135. Repeats and realleges paragraphs "1" through and including "134."

136. Requiring an individual to seek and obtain a license from the government to exercise the pre-existing right to purchase, possess, and/or carry a weapon in common use for self-defense is inconsistent with the text, history, and tradition test announced in *Bruen* and is frustrates the plain text of the Second Amendment, which "shall not be infringed."

137. Under the theory that New York's requirement that the lawful possession, purchase, and/or carriage of firearms requires individuals to apply for and obtain a license before engaging in presumptively protected conduct violates the Second and Fourteenth Amendments. 42 U.S.C. § 1983.

## AS AND FOR A FOURTH CAUSE OF ACTION

137.    Repeats and realleges paragraphs "1" through and including "136."

138.    The disclosure requirements under New York Executive Law § 296(16) for applicants for a license issued under Penal Law § 400.00, *et seq.* violates the Second and Fourteenth Amendments. 42 U.S.C. § 1983.

## AS AND FOR A FIFTH CAUSE OF ACTION

139.    Repeats and realleges paragraphs "1" through and including "137."

140.    Penal Law sections 400.00(1)(b) and 400.00(1)(o)(v) violate the Second and Fourteenth Amendments. 42 U.S.C. § 1983.

## AS AND FOR A SIXTH CAUSE OF ACTION

141.    Repeats and realleges paragraphs "1" through and including "140."

142.    Immunity for New York State's statutory licensing officers outside of New York City, Nassau County, and Suffolk County from lawsuits seeking redress for violations of the Second (and Fourteenth) Amendments violates Article I, § 1 of the New York State Constitution.

## AS AND FOR A SEVENTH CAUSE OF ACTION

143.    Repeats and realleges paragraphs "1" through and including "142."

144.    Immunity for New York State statutory licensing officers outside of New York City, Nassau County, and Suffolk County from lawsuits seeking redress for violations of the Second (and Fourteenth) Amendments, including monetary damages, violates Plaintiffs' right to equal protection under the law in violation of the Fourteenth Amendment. 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs respectfully request that this Court issue a Judgment and Order:

- Declaring that New York's requirement that the lawful possession, purchase, and/or carriage of firearms for self-defense requires individuals to apply for and obtain a license violates the Second and Fourteenth Amendments;

- Declaring that New York State's discretionary, "shall-not-issue" licensing scheme, Penal Law § 400.00, *et seq.*, violates the Second and Fourteenth Amendments and striking it in its entirety;

- Preliminarily and permanently enjoining New York State's criminal statutes under Penal Law sections 265.01, 265.02(5)(i), 265.03(2); 265.03(3), and 265.04(2) from punishing the 'mere possession' of firearms for self-defense by individuals not-otherwise-prohibited under state or federal statutes;

- Declaring that the disclosure requirements under New York Executive Law 296(16) for firearms license applicants violate the Second and Fourteenth Amendments, and preliminarily and permanently enjoining that portion of the statute;

- Declaring that Penal Law 400.00(1)(b) and 400.00(1)(o)(v) violate the Second and Fourteenth Amendments and striking it in its entirety and striking those provisions in their entirety;

- Declaring that Defendant violated Plaintiffs' Second and Fourteenth Amendment rights;

- Declaring that immunity for New York State statutory licensing officers outside of New York City, Nassau County, and Suffolk County from lawsuits seeking redress for violations of the Second (and Fourteenth) Amendments violates Article I, § 1 of the New York State Constitution;

- Declaring that immunity for New York State statutory licensing officers outside of New York City, Nassau County, and Suffolk County from lawsuits seeking redress for violations of the Second (and Fourteenth) Amendments, including monetary damages, violates Plaintiffs' right to equal protection under the law in violation of the Fourteenth Amendment. 42 U.S.C. § 1983;

- Declaring that Plaintiffs are prevailing parties under 42 U.S.C. § 1988;

- Awarding damages to Plaintiffs in at least a nominal amount, for presumed constitutional violations;

- Awarding statutory attorney's fees to Plaintiffs pursuant to 42 U.S.C. 1988;

-  Awarding costs and disbursements to Plaintiffs; and

- Awarding such other, further, and different relief as this Court may deem just and proper.

Dated: June 1, 2023
      Scarsdale, New York

                                               THE BELLANTONI LAW FIRM, PLLC
                                             *Attorneys for Plaintiffs*

By:      *Amy L. Bellantoni*
                Amy L. Bellantoni, Esq.
                2 Overhill Road, Suite 400
                Scarsdale, New York 10583
                abell@bellantoni-law.com